United States District Court
District of Connecticut
FILED AT NEW HAVEN

11/21 ,20 24

By    N. Langello
Deputy Clerk

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF | : 3:24-mj-___1055___ (RMS) |
| A WHITE INFINITI G35 BEARING | : |
| CONNECTICUT REGISTRATION 501-WCW | : |
| CURRENTLY IN LAW ENFORCEMENT | : |
| CUSTODY | : |
| | : November 19, 2024 |

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Alex Rivera, hereby depose and state as follows:

### INTRODUCTION

1.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses, including but not limited to controlled-substances offenses and money-laundering offenses.

2.      I am a Police Officer with the City of New Haven (NHPD) and have been employed by NHPD since January of 2016. From August 2022 to the present, I have been assigned to the Federal Bureau of Investigation's New Haven, Connecticut, Field Office as a sworn Task Force Officer, and, more specifically to the Safe Streets Gang Task Force. The Federal Bureau of Investigation ("FBI") is the lead agency in the Task Force that is comprised of Federal and local law enforcement personnel, and which is tasked with investigating narcotics trafficking in Southern New England. As such, my duties include, among other things, investigating violations of Titles 18 and 21 of the United States Code, such as drug trafficking offenses. I am authorized to make arrests for violations of federal law. I have participated in investigations of diverse crimes, including investigations where phone records were obtained. In connection with these

1

investigations, I have reviewed and analyzed cell site data. As a member of the Task Force, I have participated in narcotics-related investigations resulting in state and federal convictions of individuals for narcotics trafficking offenses. I have also coordinated controlled purchases of controlled substances utilizing confidential sources. I have conducted and coordinated electronic and physical surveillance of individuals involved in the illegal distribution of controlled substances. I have analyzed records documenting the illegal purchase of and sale of controlled substances. I have participated in Title III wiretap investigations. I have debriefed cooperating sources and drug distributors, as well as other local, state, and federal law enforcement officers, regarding the manner and means employed by narcotics traffickers, including the manner in which narcotics traffickers obtain, store, manufacture, transport, package and distribute their illegal drugs, finance their distribution operations, and conceal and launder the corresponding drug proceeds. The Task Force I am currently assigned to includes special agents of the FBI, and law enforcement officers with the New Haven Police Department ("NHPD"), the East Haven Police Department ("EHPD"), the Milford Police Department ("MPD"), and the Connecticut Department of Correction ("DOC").

3.     I am one of the Task Force Officers directing the investigation of members and associates of a Drug Trafficking Organization ("DTO") by Alexander **GARCIA** and Daniel **VARGAS** (together, the "**Subjects**"), both of whom were arrested on November 13, 2024, based on a criminal complaint issued by this Court on November 12, 2024 for violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C), and 846 (Conspiracy to Possess with Intent to Distribute Controlled Substances) (the "Charged Offense"). I have participated fully in this investigation and, as a result of this participation and information received from other law

enforcement officers, I am thoroughly familiar with the circumstances of the investigation and the information set forth in this affidavit.

4.      The investigation has employed several different investigative techniques, including, but not limited to:

        a.  the gathering of intelligence from reliable cooperating sources;

        b.  the use of pen registers;

        c.  the obtaining of precise location information;

        d.  physical surveillance, and;

        e.  controlled purchases of heroin and fentanyl from GARCIA and VARGAS.

5.      This affidavit is submitted in support of an application for warrant to search a white Infiniti G35 bearing Connecticut registration 501-WCW ("**Target Vehicle 2**"), as described in Attachment A. **Target Vehicle 2** is registered to an individual whose name and address are known to me, and whose connection to **VARGAS**, if any, is unknown. **Target Vehicle 2** is believed to have been used by **VARGAS** to further his drug trafficking activity, including to transport and store narcotics, as described in Attachment B-2.

## PROBABLE CAUSE

6.      On November 12, 2024, I signed an affidavit in support of search warrants for 38 Lee Avenue, First Floor, Wallingford, CT ("Target Premises"); a white BMW 328i, unknown model year, bearing Connecticut registration 866-SJU ("Target Vehicle 1"); a cellular phone assigned call number 551-235-0401 ("Target Telephone 1"); a cellular phone assigned call number 201-469-6864 ("Target Telephone 2"); and criminal complaints and arrest warrants for **VARGAS**

and **GARCIA** for the Charged Offense. A copy of that affidavit (the "Original Affidavit") has been attached as Attachment C and is incorporated here.[1]

7.      As described in greater detail in the Original Affidavit, **VARGAS** sold fentanyl with gross weight of approximately 5.5 grams to an FBI Confidential Human Source ("CS-1") from inside of **Target Vehicle 2** on September 18, 2024. *See* Original Affidavit ¶¶ 31–37. Surveillance conducted on October 29, 2024, and November 6, 2024 revealed **Target Vehicle 2** parked at the Target Premises, and **VARGAS** was observed leaving the Target Premises, apparently retrieving something from **Target Vehicle 2**, and returning to the Target Premises. *See* Original Affidavit ¶¶ 74, 82–84.

### *Arrest of VARGAS and Seizure of Target Vehicle 2*

8.      On November 13, 2024, investigators conducted surveillance at the Target Premises. Investigators observed Target Vehicle 2 exit the driveway of 38 Lee Avenue, Wallingford, Connecticut and drive away. Surveillance was unable to directly follow the vehicle but located the vehicle within a few minutes at a nearby gas station. Surveillance units observed **VARGAS** exit **Target Vehicle 2** and begin pumping gasoline into the vehicle until he was finished and observed **VARGAS** entering **Target Vehicle 2**. **VARGAS** traveled on Woodhouse Avenue, Wallingford until he entered I-91South ramp and traveled directly to Church Street, New Haven. Where he parked Target Vehicle 2 on the corner of Church Street and Elm Street, New Haven.

9.      At approximately 11:00 a.m. **VARGAS** exited his vehicle and began to walk toward the New Haven courthouse located at 121 Elm Street, New Haven. Investigators approached him and took him into custody on the criminal complaint and arrest warrant sought in

---

[1] The vehicle referred to as **Target Vehicle 2** here was referred to as **Vehicle 2** in the Original Affidavit.

the Original Affidavit. **VARGAS** was searched incident to his arrest. On his person, investigators found five (5) small Ziploc bags, each containing a white powder-like substance along with $551.00 in US currency. The substance was later tested at 600 State Stret, New Haven utilizing TruNarc tester, which returned a positive result for Cocaine.

10.     At approximately 1:15 p.m., New Haven Police Sergeant Sanchez arrived to where Target Vehicle 2 was parked and conducted an open-air sniff of the vehicle with his partner K-9 Farley. Sgt. Sanchez advised me that Farley did not alert to the presence of narcotics around the vehicle. At his initial appearance before this Court, **VARGAS** acknowledged that he used fentanyl at approximately 8:00 AM or 9:00 AM that morning.

11.     At approximately 1:20 P.M, **Target Vehicle 2** was seized by federal investigators as forfeitable property and towed to the FBI field office in New Haven for storage pursuant to 21 U.S.C. § 881(a)(4) and 18 U.S.C. § 981(b). Inside of the New Haven field office garage, investigators observed in plain view what appeared to be small Ziploc bags that appeared to contain a powder-like substance inside of the driver's side door handle.

12.     Simultaneous with **VARGAS**'s arrest, search warrants were executed on Target Vehicle 1 and the Target Premises. Although processing of evidence from those search warrants is ongoing, investigators located a quantity of apparent narcotics weighing over 200 grams (including packaging), which field tested positive for fentanyl. Investigators also located a stolen firearm and ammunition, along with approximately $29,000.00 in US currency.

## CONCLUSION

13.     Based on the information set forth in this affidavit as well as the Original Affidavit, I respectfully submit that there is probable cause to believe that **Target Vehicle 2** contains evidence of the Charged Offense.

14.     Because this warrant seeks only permission to search a vehicle that is already in law enforcement's custody, there is reasonable cause for the Court to authorize the execution of the warrant at any time in the day or night.

Alex J Rivera Jr
Digitally signed by Alex J
Rivera Jr
Date: 2024.11.21
11:42:02 -05'00'

_____
Alex J. Rivera Jr
Task Force Officer
Federal Bureau of Investigation


The truth of the foregoing affidavit has been attested to me by FBI Task Force Officer Alex Rivera over the telephone on this ___21st___ day of November 2024, at New Haven, Connecticut.

Robert M. Spector
Digitally signed by Robert
M. Spector
Date: 2024.11.21
12:32:55 -05'00'

_____
HONORABLE ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE

6

## <u>ATTACHMENT A</u>

## LOCATION TO BE SEARCHED (Target Vehicle 2)

**Target Vehicle 1** is a white Infiniti G37x bearing Connecticut Registration 501-WCW.



# ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEIZED

## (TARGET VEHICLE 1 A WHITE INFINITI G35, CONNECTICUT REGISTRATION 501-WCW)

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use of which is or has been used as the means of committing a criminal offense, namely, violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute, and distribution of controlled substances), 21 U.S.C. § 846, (conspiracy to possess with intent to distribute, and distribution of controlled substances) ("Target Offenses") including:

    a.  fentanyl, residue of fentanyl, and any other controlled substances or items appearing to be controlled substances;

    b.  paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and diluents such as mannitol, mannite, vitamin B-12, inositol, etc.;

    c.  books, records, receipts, notes, ledgers, lease agreements and other papers and documentation establishing the residence of 38 Lee Avenue, Wallingford, Connecticut;

    d.  currency related to the sale of illegal narcotics;

    e.  books, records, receipts, notes, ledgers, and other papers and documentation relating to the communication, orders and processing, storage, transportation, payment, acquisition and/or distribution of firearms, firearms parts, and/or tools and equipment used in the manufacture of firearms;

    f.  books, records, receipts, notes, ledgers, and other papers and documentation relating to the communication, orders and processing, storage, transportation, payment, acquisition and/or distribution of narcotics;

    g.  records of firearms transactions; the evidence of financial transactions relating to obtaining, transferring, secreting or spending of sums of money made from engaging in firearms or narcotics trafficking activities;

    h.  firearms, ammunition, magazines, holsters, gun storage boxes or safes, firearm cleaning kits, or documentation showing possession or use of a firearm (e.g., manuals, receipts);

    i.  cellular telephones, mobile telephone bills and address books and any other

8

records or document reflecting the telephone numbers.

j. addresses or telephone numbers in books, papers, cellular telephones, tablets or computers, and their electronically stored contents, which reflect names, addresses, telephone numbers of and communications to or from their associates and/or clients in firearms trafficking activity and/or narcotics distribution, suppliers of firearms, firearms parts and/or tools and equipment used in the manufacture of firearms; photographs and videotapes of participants and associates in narcotics distribution activities.

k. safes and other secure storage containers and their contents; and

l. identification documents and keys evidencing a possessory interest in premises, vehicles and storage containers.

# Attachment C

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

IN RE APPLICATIONS FOR CRIMINAL         :   3:24-mj-_____ (RMS)
COMPLAINT, ARREST WARRANTS, AND         :
SEARCH WARRANTS                         :   **FILED UNDER SEAL**
                                        :
                                        :   November 12, 2024

**MASTER AFFIDAVIT**

I, Alex Rivera, hereby depose and state as follows:

**INTRODUCTION**

1.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses, including but not limited to controlled-substances offenses and money-laundering offenses.

2.      I am a Police Officer with the City of New Haven (NHPD) and have been employed by NHPD since January of 2016. From August 2022 to the present, I have been assigned to the Federal Bureau of Investigation's New Haven, Connecticut, Field Office as a sworn Task Force Officer, and, more specifically to the Safe Streets Gang Task Force. The Federal Bureau of Investigation ("FBI") is the lead agency in the Task Force that is comprised of Federal and local law enforcement personnel, and which is tasked with investigating narcotics trafficking in Southern New England. As such, my duties include, among other things, investigating violations of Titles 18 and 21 of the United States Code, such as drug trafficking offenses. I am authorized to make arrests for violations of federal law. I have participated in investigations of diverse crimes, including investigations where phone records were obtained. In connection with these investigations, I have reviewed and analyzed cell site data. As a member of the Task Force, I have

1

participated in narcotics-related investigations resulting in state and federal convictions of individuals for narcotics trafficking offenses. I have also coordinated controlled purchases of controlled substances utilizing confidential sources. I have conducted and coordinated electronic and physical surveillance of individuals involved in the illegal distribution of controlled substances. I have analyzed records documenting the illegal purchase of and sale of controlled substances. I have participated in Title III wiretap investigations. I have debriefed cooperating sources and drug distributors, as well as other local, state, and federal law enforcement officers, regarding the manner and means employed by narcotics traffickers, including the manner in which narcotics traffickers obtain, store, manufacture, transport, package and distribute their illegal drugs, finance their distribution operations, and conceal and launder the corresponding drug proceeds.

3.      The Task Force I am currently assigned to includes special agents of the FBI, and law enforcement officers with the New Haven Police Department ("NHPD"), the East Haven Police Department ("EHPD"), the Milford Police Department ("MPD"), and the Connecticut Department of Correction ("DOC"). I am one of the Task Force Officers directing the investigation of members and associates of a Drug Trafficking Organization ("DTO") by Alexander **GARCIA** and Daniel **VARGAS** (together, the "**Subjects**"), in and around New Haven, Connecticut, for violations of Title 21, United States Code, Sections 841(a)(1) and 846 (Conspiracy to Possess with Intent to Distribute Controlled Substances), and 843(b) (Use of a Communications Facility to Further Drug Trafficking) (hereinafter, the "**Target Offenses**"). I have participated fully in this investigation and, as a result of this participation and information received from other law enforcement officers, I am thoroughly familiar with the circumstances of the investigation and the information set forth in this affidavit.

2

4.      The investigation has employed several different investigative techniques, including, but not limited to:

      a.  the gathering of intelligence from reliable cooperating sources;

      b.  the use of pen registers;

      c.  the obtaining of precise location information;

      d.  physical surveillance, and;

      e.  controlled purchases of heroin and fentanyl from GARCIA and VARGAS.

5.      Based upon information known to me as a result of my participation in this investigation, as well as information, which I have determined to be accurate and reliable, provided to me by other law enforcement officers, including my co-case agents in this investigation, I am familiar with the information discussed herein.  Where the contents of documents, or communications with others, are reported herein, they are set forth in substance and part, unless otherwise indicated. Based on my training and experience, I know that narcotics traffickers often use cellular telephones and often speak to one another using coded, cryptic or slang words and phrases, in the belief that, by doing so, they can thwart the efforts of law enforcement to identify them and their activities and to seize their drugs and/or assets. From my experience, I am familiar with many of the codes, words and phrases that are frequently used by drug traffickers in the acquisition and distribution of narcotics. I know that drug traffickers frequently have access to several cellular telephones, and that they periodically use newly acquired cellular telephones. I also know that narcotics traffickers and distributors frequently use cellular telephones subscribed to by other persons or businesses and prepaid cellular telephones that require the purchaser to provide little or no identifying information to purchase, activate, and utilize, all of which is done to avoid detection and thwart the efforts of law enforcement.

3

6.      Based on my training and experience, and consultation with, and information from, other law enforcement sources, including sources with expertise pertaining to the features and functionality of cellular telephones and computers, I know the following information tends to exist on wireless telephones, including wireless telephones utilized by those engaged in firearms and narcotics trafficking activities:

a.  the telephone call number and other identifiers (ESN number, IMSI, IMEI, MEID, and SIM card number) associated with said device/s;

b.  call logs/histories, numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images and videos stored in the memory of said device/s;

c.  descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described offenses;

d.  records which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

e.  information showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

f.  GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

g.  saved searches, locations, and route history in the memory of said device/s; and,

4

h. internet browsing history, to include, internet searches in the memory of said device/s.

7.    This affidavit is submitted in support of the Criminal Complaints and arrest warrants for the **Subjects** described below and search warrants for a residence, two vehicles, and a cellular telephone device described more fully below and referred to throughout this affidavit as the "**Target Premises**," "**Target Vehicles**," and "**Target Telephones**."

8.    As discussed more fully below, there is probable cause to believe, and I do believe, that the **Subjects** have committed and are committing the **Target Offenses**. As set forth in Attachments A and B, the **Target Premises**, **Target Vehicles**, and **Target Telephones** are believed to hold evidence of the **Target Offenses**, including but not limited to quantities of controlled substances, or residue of these substances, drug paraphernalia, drug packaging materials, cash derived from the sale of drugs, documents, and records relating to the **Target Offenses**, including records stored in electronic form, as well as telephones utilized in furtherance of drug trafficking.

9.    The following individuals have been identified as **Subjects** in this case who have committed the **Target Offenses**. Their involvement has been established using various investigative methods, including but not limited to, physical surveillance, at times in conjunction with contemporaneous review of records, including telephone service provider records, motor vehicle records, and utility records. Accordingly, I am submitting this affidavit in support of Criminal Complaints and arrest warrants for the following individuals:

a. **ALEXANDER GARCIA** (DOB xx/xx/1996, date known to me) is believed to be a leader in the drug trafficking organization, in partnership with **VARGAS**. **GARCIA** and **VARGAS** share a single telephone (**Target Telephone 1** and later

**Target Telephone 2**), alternating on a shift basis, which they use to arrange the sale of narcotics throughout New Haven and the surrounding area. **GARCIA** has misdemeanor convictions for Interfering with Police in April of 2023 and Possession of a Controlled Substance in November of 2022. **GARCIA** has pending felony charges for Possession of Narcotics with Intent to Sell from June of 2024. He also has additional pending misdemeanor charges.

b. **DANIEL VARGAS** (DOB xx/xx/1997, date known to me), is believed to be a leader in the drug trafficking organization, in partnership with **GARCIA**. As explained above, **VARGAS** shares the **Target Telephone** with **GARCIA** on a shift basis, which both **Subjects** use to arrange narcotics transactions throughout New Haven and the surrounding area. **VARGAS** has one prior felony conviction for possession of narcotics with intent to sell in November 2017.  He has pending felony charges for Criminal Possession of a Firearm, Illegal Possession of a Large Capacity Magazine, Illegal Possession of a Weapon in a Motor Vehicle, and Obliterated Serial (ghost gun) from October of 2022. **VARGAS** has multiple prior misdemeanor convictions and additional pending misdemeanor charges.

10.    The locations and property for which search warrants are sought are as follows:

a. The **Target Premises** is the first floor of a multi-family home located at 38 Lee Avenue, Wallingford, Connecticut, as described in Attachment A-1. The **Target Premises** is believed to be **GARCIA** and **VARGAS**'s primary residence where they store narcotics and proceeds of drug trafficking, as described in Attachment B-1.

b. **Target Vehicle 1** is white BMW 328i, unknown model year, bearing Connecticut registration "866-SJU," as described in Attachment A-2. **Target Vehicle 1** is believed to be used by **GARCIA** to further his drug trafficking activity, including to transport and store narcotics, as described in Attachment B-2.

c. The **Target Telephone 1** is a cellular telephone device associated with the telephone number 551-235-0401, as described in Attachment A-3. **Target Telephone 1** is believed to be shared by **GARCIA** and **VARGAS**. The **Subjects** use **Target Telephone 1** in furtherance of the drug trafficking organization, including to arrange narcotics transactions and communicate with drug customers.

d. **Target Telephone 2** is a cellular telephone device associated with the telephone number 201-469-6864, as described in Attachment A-4. **Target Telephone 2** is believed to be shared by **GARCIA** and **VARGAS**. Since at least November 5, 2024, the **Subjects** have used **Target Telephone 2** in furtherance of the drug trafficking organization, including to arrange narcotics transactions and communicate with drug customers.

11.    Because the information and evidence gathered during this investigation is voluminous, I have not included every fact known to me concerning this investigation. Instead, I have set forth those facts which I believe are necessary to establish the existence of probable cause to support the requested warrants.

## SUMMARY OF THE INVESTIGATION

12.    In or about August of 2024, the FBI New Haven Safe Streets Gang Task Force initiated an investigation into a drug trafficking organization that distributes heroin and fentanyl led by **GARCIA** and **VARGAS**, who are known as "Drake & Josh" and/or "Mikey & Tony."

7

13.     The investigation employed various investigative techniques, including but not limited to, the gathering of intelligence from confidential informants, the gathering of precise location information on **Target Telephone 1** (obtained through a prior federal search warrant), and physical surveillance.

14.     Using the forgoing various investigative techniques, investigators have ascertained the following regarding the structure of the organization and the roles of the conspirators.

15.     **GARCIA** and **VARGAS** are believed to be a source of supply and redistributors for their DTO.

16.     To date, FBI Safe Streets Gang Task Force has conducted seven (7) controlled narcotics purchases from the DTO. Fentanyl was seized from the DTO as a result of the controlled narcotics purchases.

## BASIS AND SCOPE OF INFORMATION

17.     I have personally participated in the investigation of the offenses that are the subject of this affidavit.  The statements contained in this affidavit are based, in part, upon my personal knowledge and, in part, upon information and belief.  The sources of information and belief are, among other things:

    a.  my training and experience;

    b.  information, and oral and written reports, regarding this and other investigations which your affiant has received, directly or indirectly, from law enforcement authorities, including, but not limited to, Special Agents of the FBI, sworn members of the Task Force, other federal authorities, and detectives and officers of area police departments;

    c.   physical surveillance conducted by law enforcement agents which has been reported to me either directly or indirectly;

    d.   pen register data and/or telephone call detail records, as well as telephone subscriber information;

    e.   content of consensually recorded or monitored calls and/or conversations;

    f.   review of vehicle registration records and/or court records;

    g.   debriefings of one or more cooperating sources, reported to me directly or indirectly and

    h.   other information that I have reviewed and determined to be accurate and reliable.

## CONFIDENTIAL HUMAN SOURCE

18.    The FBI investigation into **GARCIA** and **VARGAS** has involved the use of a Confidential Human Source ("CS-1"). CS-1 has provided reliable and actionable information to investigators that has been corroborated by conducting controlled buys in numerous cases. CS-1 has no criminal convictions, no pending charges, and is being monetarily compensated. CS-1 is willing to testify if necessary.

19.    CS-1 reported to investigators that they received the number of 551-235-0401, (that is, the number for **Target Telephone 1**) from a third party that introduced CS-1 to **GARCIA** and **VARGAS** in the past. CS-1 stated that they knew **GARCIA** and **VARGAS** as "Drake and Josh." CS-1 further stated that **GARCIA** and **VARGAS** shared **Target Telephone 1** to arrange drug transactions and work a shift schedule to distribute narcotics. On November 5, 2024, CS-1 advised investigators that **GARCIA** called them from a new phone number, 201-469-6864, (**Target Telephone 2)** and advised that "they" (i.e., **GARCIA** and **VARGAS**) got a new number.

**PROBABLE CAUSE**

**Information Developed through CS-1**

*__Controlled Buy #1 – Week Ending August 31, 2024__*

20.     During the week ending August 31, 2024, at the direction of, and under the supervision of investigators, CS-1 purchased approximately 4.386 grams of suspected Fentanyl from **GARCIA** and **VARGAS**.

21.     At the direction of investigators, CS-1 agreed to arrange the purchase of fentanyl from **GARCIA** and **VARGAS**. As noted above, CS-1 was aware that **GARCIA** and **VARGAS** could be reached via the **Target Telephone 1**. Accordingly, at the direction of investigators, CS-1 called the **Target Telephone 1** to discuss the logistics of the purchase, and **GARCIA** answered the call. During the phone call, **GARCIA** directed CS-1 to meet at Il Gabbiano restaurant on Long Wharf in New Haven to complete the transaction.

22.     Investigators provided CS-1 with audio/video recording equipment and $300 in U.S. Government funds to utilize during the controlled purchase. Investigators also searched CS-1's person and vehicle for contraband, which yielded negative results. Investigators observed CS-1 arrive and park at the agreed-upon meeting location. Shortly thereafter, a white BMW 3 series with tinted windows bearing Connecticut registration 866-SJU (**Target Vehicle 1**) parked near CS-1's vehicle. Investigators observed CS-1 exit their vehicle and enter **Target Vehicle 1**. Shortly after, CS-1 exited **Target Vehicle 1**, entered their vehicle, and drove away from **Target Vehicle 1**.

23.     Investigators searched the registration for **Target Vehicle 1** but discovered that the vehicle did not have any registration information, suggesting that the registration is invalid.

10

24.    After the transaction, CS-1 met with investigators at a predetermined location and debriefed. CS-1 stated **GARCIA** had met in the parking lot of Il Gabbiano restaurant as agreed. CS-1 confirmed that **GARCIA** was the sole occupant of **Target Vehicle 1**. CS-1 stated that they entered **Target Vehicle 1** and paid **GARCIA** $300.00 in funds provided by investigators. In return, **GARCIA** handed CS-1 apparent fentanyl packaged in small Ziploc style bags which were inside of a black plastic bag. Investigators reviewed the audio and video recording of the meeting between CS-1 and **GARCIA** and determined that it is consistent with CS-1's report.

25.    CS-1 provided investigators with the purchased narcotics, which field tested positive for the presence of fentanyl and had a gross weight of 10 grams, including packaging. Confirmatory lab analysis revealed the substance to be fentanyl and xylazine with a net weight of 4.386 grams.

### *Controlled Buy #2 – Week Ending September 14, 2024*

26.    During the week ending September 14, 2024, at the direction of, and under the supervision of investigators, CS-1 purchased approximately 3.89 grams of suspected Fentanyl from the Drug Trafficking Organization (DTO) of **GARCIA** and **VARGAS**.

27.    At the direction of investigators, CS-1 agreed to arrange the purchase of fentanyl from **GARCIA** and **VARGAS**, whom they again contacted by calling the **Target Telephone 1**. **GARCIA** again answered the call. **GARCIA** directed CS-1 to meet at a commuter parking lot on Long Wharf in New Haven to complete the purchase.

28.    Investigators provided CS-1 with audio/video recording equipment and $200 in U.S. Government funds to utilize during the controlled purchase. On or around September 09, 2024, investigators observed CS-1 arrive at the predetermined commuter parking lot. Shortly thereafter, **Target Vehicle 1** arrived to the predetermined location. Investigators observed

11

**GARCIA** operating **Target Vehicle 1**, which parked near CS-1's vehicle. Investigators observed CS-1 exit their vehicle and enter **Target Vehicle 1**. Shortly after, CS-1 exited **Target Vehicle 1**, entered their vehicle, and drove away from **Target Vehicle 1**.

29.    After the transaction, CS-1 met with investigators at a predetermined location and debriefed. CS-1 confirmed that they met **GARCIA** at the commuter parking lot on Long Wharf in New Haven. CS-1 stated **GARCIA** arrived in a white BMW with tinted windows, identified as **Target Vehicle 1**, and **GARCIA** was the sole occupant of the vehicle. CS-1 stated that they entered **Target Vehicle 1** and paid **GARCIA** $200.00 in funds provided by investigators. In return, **GARCIA** handed them apparent fentanyl packaged in smaller Ziploc bags. Investigators reviewed the audio and video recording of the meeting between CS-1 and **GARCIA** and determined that it is consistent with CS-1's report.

30.    CS-1 provided investigators with the purchased narcotics, which field tested positive for the presence of fentanyl and had a gross weight of 4.5 grams. Confirmatory lab analysis revealed the substance to be fentanyl and xylazine with a net weight of 3.89 grams.

### _Controlled Buy #3 – Week Ending September 21, 2024_

31.    During the week ending September 21, 2024, at the direction of, and under the supervision of investigators, CS-1 purchased approximately 5.5 grams of suspected Fentanyl from the DTO of **GARCIA** and **VARGAS**.

32.    At the direction of investigators, CS-1 agreed to arrange the purchase of fentanyl from **GARCIA** and **VARGAS**, whom they contacted by calling the **Target Telephone 1**. **VARGAS** answered the call. **VARGAS** directed CS-1 to meet at a commuter parking lot on Long Wharf in New Haven, which was the same lot as the previous controlled buy during the week ending September 14.

33.    Investigators provided CS-1 with audio/video recording equipment and $200 in U.S. Government funds to utilize during the controlled purchase. On or around September 18, 2024, Investigators observed CS-1 arrive and park at the agreed-upon meeting location. Shortly thereafter CS-1 entered a white Infiniti G35 with tinted windows bearing Connecticut registration 501-WCW (Vehicle 2) which was parked nearby. After a short period, CS-1 exited Vehicle 2, entered their vehicle, and drove away from Vehicle 2.

34.    Vehicle 2 is registered to an individual whose name is known to me with an address in Southington, Connecticut. The connection between this individual and **GARCIA** and **VARGAS**, if any, is unknown.

35.    After the transaction, CS-1 met with investigators at a predetermined location and debriefed. CS-1 confirmed that they met **VARGAS** at the predetermined commuter parking lot on Long Wharf in New Haven. CS-1 stated **VARGAS** was already parked in a white Infiniti with tinted windows when CS-1 arrived. **VARGAS** was the sole occupant of the vehicle. CS-1 stated that they entered Vehicle 2 and paid **VARGAS** $200.00 in funds provided by investigators. In return, **VARGAS** handed CS-1 apparent fentanyl packaged in small Ziploc baggies. Investigators reviewed the audio and video recording of the meeting between CS-1 and **VARGAS** and determined that it is consistent with CS-1's report.

36.    In reviewing the recordings, investigators observed the male inside of Vehicle 2 and positively identified him as **VARGAS**. Also, while reviewing the video, Investigators observed CS-1 contact **VARGAS** on the **Target Telephone 1** as CS-1 arrived at the pre-determined meet location. **VARGAS** answered the **Target Telephone 1** and informed CS-1 that he was at the meet location, where CS-1 was able to locate **VARGAS** and enter his vehicle to conduct the controlled purchase.

37.    CS-1 provided investigators with the purchased narcotics, which field tested positive for the presence of fentanyl and had a gross weight of 5.5 grams. Confirmatory lab analysis is pending.

### *Controlled Buy #4 – Week Ending September 28, 2024*

38.    During the week ending September 28, 2024, at the direction of, and under the supervision of investigators, CS-1 purchased approximately 11 grams of suspected Fentanyl from the DTO of **GARCIA** and **VARGAS**.

39.    At the direction of investigators, CS-1 agreed to arrange the purchase of fentanyl from **GARCIA** and **VARGAS**, whom they contacted by calling the **Target Telephone 1**. **GARCIA** answered the call. **GARCIA** directed CS-1 to meet at a Taco Bell in New Haven.

40.    Investigators provided CS-1 with audio/video recording equipment and $400 in U.S. Government funds to utilize during the controlled purchase. On or around September 25, 2024, investigators observed CS-1 arrive and park at the Taco Bell. Shortly thereafter, **Target Vehicle 1**, which investigators observed was operated by **GARCIA**, parked near CS-1's vehicle. Investigators observed CS-1 exit their vehicle and enter **Target Vehicle 1**. Shortly after, CS-1 exited **Target Vehicle 1**, entered CS-1's vehicle, and drove away from **Target Vehicle 1**.

41.    After the transaction, CS-1 met with investigators at a predetermined location and debriefed. CS-1 confirmed that they met **GARCIA** at a Taco Bell in New Haven. CS-1 stated GARCIA arrived in a white BMW with tinted windows, identified as **Target Vehicle 1**, and **GARCIA** was the sole occupant of the vehicle. CS-1 stated that they entered **Target Vehicle 1** and paid **GARCIA** $400.00 in funds provided by investigators. In return, **GARCIA** handed CS-1 apparent fentanyl packaged in small Ziploc baggies. Investigators reviewed the audio and video

recording of the meeting between CS-1 and **GARCIA** and determined that it is consistent with CS-1's report.

42.     CS-1 provided investigators with the purchased narcotics which field tested positive for the presence of fentanyl and had a gross weight of 11 grams. Confirmatory lab analysis is pending.

### *Controlled Buy #5 – Week Ending October 12, 2024*

43.     During the week ending October 12, 2024, at the direction of, and under the supervision of investigators, CS-1 purchased approximately 12 grams of suspected fentanyl from the DTO of **GARCIA** and **VARGAS**.

44.     At the direction of investigators, CS-1 agreed to arrange the purchase of fentanyl from **GARCIA** and **VARGAS**, whom they contacted by calling the **Target Telephone 1**. **GARCIA** answered the call. **GARCIA** directed CS-1 to meet at Long Wharf in New Haven.

45.     Investigators provided CS-1 with audio/video recording equipment and $500 in U.S. Government funds to utilize during the controlled purchase. On or around October 8, 2024, investigators observed CS-1 arrive and park in the Long Wharf area. Shortly thereafter, **Target Vehicle 1**, which investigators observed was operated by **GARCIA**, parked near CS-1's vehicle. Investigators observed CS-1 exit their vehicle and enter **Target Vehicle 1**. Shortly after, CS-1 exited **Target Vehicle 1**, entered CS-1's vehicle, and drove away from **Target Vehicle 1**.

46.     After the transaction, CS-1 met with investigators at a predetermined location and debriefed. CS-1 confirmed that they met **GARCIA** at the commuter parking lot on Long Wharf in New Haven. CS-1 stated **GARCIA** arrived in a white BMW with tinted windows, identified as **Target Vehicle 1**, and **GARCIA** was the sole occupant of the vehicle. CS-1 stated that they entered **Target Vehicle 1** and paid **GARCIA** $500.00 in funds provided by investigators. In return,

**GARCIA** handed CS-1 apparent fentanyl packaged in small Ziploc baggies. Investigators reviewed the audio and video recording of the meeting between CS-1 and **GARCIA** and determined that it is consistent with CS-1's report.

47.    CS-1 provided investigators with the purchased narcotics which field tested positive for the presence of fentanyl and had a gross weight of 12 grams. Confirmatory lab analysis is pending.

### _Controlled Buy #6 – Week Ending October 18, 2024_

48.    During the week ending October 18, 2024, at the direction of, and under the supervision of investigators, CS-1 purchased approximately 26 grams of suspected fentanyl from the DTO of **GARCIA** and **VARGAS**.

49.    At the direction of investigators, CS-1 agreed to arrange the purchase of fentanyl from **GARCIA** and **VARGAS**, whom they contacted by calling the **Target Telephone 1**. **GARCIA** answered the call. **GARCIA** directed CS-1 to meet at Long Wharf in New Haven.

50.    Investigators provided CS-1 with audio/video recording equipment and $1,000.00 in U.S. Government funds to utilize during the controlled purchase. On or around October 16, 2024, Investigators observed CS-1 park in the area of IKEA (450 Sargent Drive, New Haven). Shortly thereafter, investigators observed **Target Vehicle 1** already parked near CS-1. Investigators observed CS-1 exit their vehicle and enter **Target Vehicle 1**. Shortly after, CS-1 exited **Target Vehicle 1**, entered CS-1's vehicle, and drove away from **Target Vehicle 1**.

51.    After the transaction, CS-1 met with investigators at a predetermined location and debriefed. CS-1 confirmed that they met **GARCIA** at the parking lot of IKEA in New Haven. CS-1 stated **GARCIA** was already parked in IKEA inside of a white BMW with tinted windows and was the sole occupant of the vehicle. CS-1 stated that they entered the BMW (identified as **Target**

**Vehicle 1**) and paid **GARCIA** $1,000.00 in funds provided by investigators. In return, **GARCIA** handed CS-1 apparent fentanyl packaged in small Ziploc baggies. Investigators reviewed the audio and video recording of the meeting between CS-1 and **GARCIA** and determined that it is consistent with CS-1's report.

52.    CS-1 provided investigators with the purchased narcotics which field tested positive for the presence of fentanyl and had a gross weight of 26 grams. Confirmatory lab analysis is pending.

53.    During the controlled buy, investigators observed **VARGAS** operating a blue Acura RDX SUV bearing Connecticut registration 798-PRN ("Vehicle 3"). Investigators observed **VARGAS** enter the IKEA parking lot during the time CS-1 and **GARCIA** were conducting the controlled purchase. Investigators observed **VARGAS** park near the area of **Target Vehicle 1**, exit Vehicle 3, and walk towards **Target Vehicle 1**. Shortly thereafter, **VARGAS** walked away from the driver's window of **Target Vehicle 1** and entered Vehicle 3.

54.    After further review of the audio and video surveillance, investigators observed **VARGAS** approach the driver's side of **Target Vehicle 1**. **GARCIA** lowered the window and they both began speaking. **GARCIA** grabbed one of the two phones on his lap, handed it to **VARGAS**, and stated "Take this, this shit boomin right now [i.e., the phone]. Everybody coming over here though, I don't know if you want to move to the other side." **VARGAS** walked away from **GARCIA** with the phone.

17

### *GARCIA and VARGAS Begin Using Target Telephone 2*

55.    On or around November 5, 2024, CS-1 reported to investigators that they had received a call from **GARCIA** using the number associated with **Target Telephone 2**. CS-1 stated that **GARCIA** told them that "they" (that is, **GARCIA** and **VARGAS**) got a new number.

56.    Based on my training and experience, as noted above, I know that drug traffickers frequently have access to several cellular telephones, and that they periodically use newly acquired cellular telephones. In particular, drug traffickers may "drop" cell phones and begin using phones with new numbers in an effort to evade law enforcement.

57.    Although **GARCIA** and **VARGAS** appear to have begun using a new phone number (**Target Telephone 2**) to coordinate narcotics transactions, location information for **Target Telephone 1** suggests that it was still located in the **Target Premises** as of November 7, 2024.

### *Controlled Buy #7 – Week Ending November 9, 2024*

58.    During the week ending November 9, 2024, at the direction of, and under the supervision of investigators, CS-1 purchased approximately 21.5 grams of suspected Fentanyl from the DTO of **GARCIA** and **VARGAS**.

59.    At the direction of investigators, CS-1 agreed to arrange the purchase of fentanyl from **GARCIA** and **VARGAS**, whom they contacted by calling the **Target Telephone 2**. **GARCIA** answered the call. **GARCIA** and CS-1 agreed to meet at Walmart in Wallingford, Connecticut.

60.    Investigators provided CS-1 with audio/video recording equipment and $1,000.00 in U.S. Government funds to utilize during the controlled purchase. On or around November 8, 2024, Investigators observed CS-1 park in the area of Walmart (844 North Colony Road,

18

Wallingford, Connecticut). Shortly thereafter, investigators observed **Target Vehicle 1** driving through the parking lot and park near CS-1. Investigators observed CS-1 exit their vehicle and enter **Target Vehicle 1**. Shortly after, CS-1 exited **Target Vehicle 1**, entered CS-1's vehicle, and drove away from **Target Vehicle 1**.

61.     After the transaction, CS-1 met with investigators at a predetermined location and debriefed. CS-1 confirmed that they met **GARCIA** at the parking lot of Walmart in Wallingford, Connecticut. CS-1 stated **GARCIA** was the sole occupant of a white BMW with tinted windows. CS-1 stated that they entered the BMW (identified as **Target Vehicle 1**) and paid **GARCIA** $1,000.00 in funds provided by investigators. In return, **GARCIA** handed CS-1 apparent fentanyl packaged in small Ziploc baggies. Investigators reviewed the audio and video recording of the meeting between CS-1 and **GARCIA** and determined that it is consistent with CS-1's report.

62.     CS-1 provided investigators with the purchased narcotics which field tested positive for the presence of fentanyl and had a gross weight of 21.5 grams. Confirmatory lab analysis is pending.

### Information Developed through Surveillance

### *October 15, 2024, Physical Surveillance of 38 Lee Ave, Wallingford (the Target Premises)*

63.     On October 15, 2024, investigators began to monitor pen register and location data for **Target Telephone 1**, obtained pursuant to a prior federal search warrant. Location data showed **Target Telephone 1** in the general area of Wallingford Public Library, located at 200 N Main Street, Wallingford, Connecticut. Investigators thus drove to the area where **Target Telephone 1** appeared to be located.

64.     While monitoring the location data, I observed the location data showing the streets between Church Street to Christian Street, Wallingford. Lee Avenue is located between Church

19

Street and Christian Street. While I was driving on Lee Avenue, I located **Target Vehicle 1** parked

behind 38 Lee Avenue, Wallingford, Connecticut (the **Target Premises**).

65.     Investigators observed **Target Vehicle 1** exit the driveway of the **Target Premises**

and begin traveling on Lee Avenue towards North Colony Rd. **Target Vehicle 1** turned right onto

North Colony Rd and turned into the Sunoco Gas Station and parked. At the gas station, I observed

**GARCIA** exit **Target Vehicle 1** and enter the store. **GARCIA** exited shortly after and began

pumping gasoline into **Target Vehicle 1**. I observed that **GARCIA** was the sole occupant of

**Target Vehicle 1**.

66.     Investigators next observed **GARCIA** enter **Target Vehicle 1** and travel on North

Colony Road, eventually traveling on I-91 Southbound. **Target Vehicle 1** exited off exit 8 toward

Middletown Avenue, New Haven.

67.     **Target Vehicle 1** drove towards a McDonalds restaurant at 225 Foxon Blvd, New

Haven and entered the parking lot. **Target Vehicle 1** parked next to a red pickup truck and an

unknown male entered the passenger seat of **Target Vehicle 1**. After a short period, the unknown

male exited **Target Vehicle 1** and returned to the red pickup truck.

68.     **Target Vehicle 1** left the parking lot, and investigators followed, observing it as it

eventually parked in the driveway of a residence located at 1619 Quinnipiac Avenue, New Haven.

An unknown male exited the address, walked up to the driver's side window of **Target Vehicle 1**,

and spoke with **GARCIA**. The unknown male reached into the vehicle and an exchange was

observed. The unknown male then walked back into the residence. **Target Vehicle 1** exited the

driveway and surveillance was terminated.

### *October 28, 2024 Social Media Post and Spot Check of the Target Premises*

69.    I was monitoring Facebook and determined that **GARCIA** used a Facebook profile with the name "AJ Escobar." Specifically, I have become familiar with **GARCIA**'s appearance through this investigation, and I could positively identify **GARCIA** as the male depicted in the photographs on the AJ Escobar account.

70.    On October 24, 2024, I observed that **GARCIA** shared multiple posts from the AJ Escobar account suggesting that he was currently in Medellin, Colombia. Specifically, **GARCIA** posting a photograph of himself with "Medellin" on a wall behind him and the location Medellin, Colombia tagged.

71.    Investigators observed a post on the social media website Instagram by user "bley800," believed to be used by an individual with the initials J.S. whose name is known to me. In early hours of October 25, 2024, the bley800 account posted a photograph of J.S standing next to **GARCIA** along with another unknown male. The bley800 account tagged the location Medellin, Colombia.

72.    Although **GARCIA's** social media activity indicated that he was in Medellin, Colombia, location information for the **Target Telephone 1** indicated it was still located in the area of the **Target Premises**. On October 25, 2024, at approximately 07:49 A.M, investigators observed **Target Vehicle 1** and Vehicle 3 were both parked in the driveway of the **Target Premises**. As noted above, **VARGAS** had been seen operating Vehicle 3 during the controlled buy in the week ending October 18, 2024.

73.    Later in the day, investigators conducted a spot check of the **Target Premises**. **Target Vehicle 1** remained parked in the driveway, but Vehicle 3 was no longer present. Location information for the **Target Telephone 1** suggested that the device was located in the

area of Forbes Avenue in New Haven. Utilizing the New Haven Police Department's license plate readers, investigators determined that Vehicle 3 was driving in New Haven.

### *October 29, 2024 Physical Surveillance of the Target Premises*

74.    On October 29, 2024, location information suggested that **Target Telephone 1** was in the area of the **Target Premises**. Investigators observed **Target Vehicle 1** and Vehicle 2 parked in the driveway of the **Target Premises**.

75.    Investigators observed **Target Vehicle 1** exit the driveway and begin traveling toward North Colony Road where it turned onto North Colony Road. Investigators followed **Target Vehicle 1** as it entered the I-91 South entrance ramp and eventually exited off exit 8 toward Middletown Avenue, New Haven.

76.    Investigators followed **Target Vehicle 1** to Roosevelt Street Ext, New Haven, where Investigators observed it park. An unknown male walked up to the passenger side, and **GARCIA** was observed operating the vehicle. Shortly after, the unknown male walked away from **Target Vehicle 1**, which then drove away.

77.    Investigators followed **Target Vehicle 1** as it drove through North Haven and eventually entered an I-91 North entrance ramp. Investigators followed **Target Vehicle 1** to the **Target Premises**, where they observed **Target Vehicle 1** park in the driveway of the residence. **GARCIA** exited **Target Vehicle 1** and entered the **Target Premises**. Shortly after, **GARCIA** exited the residence and re-entered **Target Vehicle 1**.

78.    **Target Vehicle 1** began traveling on North Colony Road where investigators followed it onto I-91 South until it eventually exited off exit 8 toward Middletown Avenue, New Haven. **Target Vehicle 1** was observed entering the parking lot of McDonald's, 225 Foxon Blvd, New Haven, where it parked. An unknown female entered the passenger seat for a brief

moment and then exited. **Target Vehicle 1** exited the McDonald's parking lot.  Based on my training and experience, I believe the interaction between the unknown female and **GARCIA** was consistent with a hand-to-hand drug transaction.

79.    Investigators then followed **Target Vehicle 1** as it traveled to a Mobil gas station located at the corner of Foxon Blvd and Quinnipiac Avenue. An unknown male was observed walking towards **Target Vehicle 1**, which was parked at the gas pumps. The unknown male was observed walking away from **Target Vehicle 1.** Investigators observed **Target Vehicle 1** leaving the gas station and turning north onto Quinnipiac Avenue, New Haven. Based on my training and experience, I believe that the interaction at the Mobile gas station was consistent with a hand-to-hand drug transaction.

80.    Investigators followed **Target Vehicle 1** until it reached Roosevelt Street Ext, New Haven. Because Roosevelt Street Ext is a dead-end street with minimal parking, Investigators did not follow **Target Vehicle 1** onto the street itself. Investigators believed from experience in other cases that following the vehicle on the dead-end road would make it obvious that investigators were following **Target Vehicle 1** which would raise suspicion to **GARCIA** and would potentially jeopardize the investigation.

81.    Investigators observed **Target Vehicle 1** exiting Roosevelt Street Ext and entering the parking lot of Empire Liquor, 1655 Quinnipiac Avenue, New Haven and parking. The same unknown male Investigators observed earlier on Roosevelt Street Ext (¶ 76) entered **Target Vehicle 1** for a brief moment, exited, and walked away. Another unknown male, who was parked in a white Ford pickup truck, exited their vehicle and entered **Target Vehicle 1**. Shortly after the unknown male exited **Target Vehicle 1**, entered their Ford, and drove away.

23

Surveillance of **GARCIA** was terminated.  Based on my training and experience, I believe that the interactions observed in the parking lot were consistent with hand-to-hand drug transactions.

### *November 6, 2024 Physical Surveillance of the Target Premises*

82.     Information obtained from the Wallingford Electrical Company revealed that **GARCIA** signed a Contract of Service with the listed address as 38 Lee Avenue, 1st floor, Wallingford, Connecticut. A law enforcement database also revealed that **VARGAS** had the address of 38 Lee Avenue, 1st floor, Wallingford, Connecticut as an address.

83.     On November 6, 2024, at approximately 8:30 A.M, I drove by the **Target Premises** and observed **Target Vehicle 1** and Vehicle 2 parked in the driveway.

84.     At approximately 10:19 A.M, investigators began conducting surveillance on the **Target Premises** and observed Vehicle 2 parked in the driveway.  At approximately 10:20 A.M, I observed **VARGAS** walking from the rear left side of the **Target Premises** towards Vehicle 2 open the door. **VARGAS** opened the driver's door and appeared to grab something from inside of the vehicle. **VARGAS** closed the driver's door, locked the vehicle, and walked towards the rear left side of the **Target Premises**, out of sight.

85.     Publicly available property records suggest that 38 Lee Avenue has three residential units. On November 6, 2024, an investigator approached the **Target Premises** to conduct a ruse interview—that is, to speak with the occupants of the home under false pretenses in order to observe the layout of 38 Lee Avenue and confirm the location of the **Target Premises** within the multi-unit building. Upon approaching the entrance to 38 Lee Avenue, the investigator determined that the shared front door that was unlocked. The investigator opened the door and was able to observe a common area shared by all three units. Within the common area, the investigator observed the front door to the first-floor apartment. There was a staircase that leading up to the

second-floor apartment door, along with another staircase that lead up to the third-floor apartment door. The investigator further determined that a back door near the left side of the home leads to the first-floor apartment door and a metal staircase in the back leads up to the second- and third-floor fire escape. The investigator knocked on the front doors for each unit, but received no response.

## GENERAL INFORMATION REGARDING DRUG TRAFFICKING

86.     During my tenure as a law enforcement officer, I have investigated and participated in operations which involved, in part, drug trafficking violations, the flow of the illegal proceeds obtained from drug trafficking and related offenses.   Search warrants relating to these investigations have covered, among other locations, residences, vehicles, businesses, stash locations and distribution locations used by drug traffickers and their co-conspirators.

87.      Materials searched for and recovered in these locations have included, among other evidence, the following: controlled substances; drug paraphernalia, such as scales, processing materials and packaging materials; books and records reflecting drug sales, the transfer or transportation of drugs and amounts of monies owed for drugs; records reflecting the names, addresses and telephone numbers of co-conspirators; sales receipts and other records reflecting the expenditure of monies that are proceeds from unlawful drug distribution; currency and money wrappers; records of bank transactions made to conceal and launder drug trafficking proceeds; cellular telephones; computers, computer disks and answering machines; and various valuable assets such as real property and automobiles that were purchased with the proceeds of unlawful drug trafficking.   These items obtained during the executions of said search warrants, have

constituted evidence of drug violations, the acquisitions of assets with drug trafficking proceeds, and the use of the assets to facilitate drug trafficking violations.

88.    Based on my training, experience and participation in this and other drug trafficking investigations, I know that:

a.  drug traffickers often place assets in the names other than their own to avoid detection of these assets by law enforcement;

b.  drug traffickers often place assets in the names of businesses and corporate entities as nominee title holders in order to avoid detection of these assets by law enforcement;

c.  even though these assets are placed in the names of other persons or entities, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

d.  drug traffickers must maintain and have quick access to large amounts of United States currency, foreign currency, or other liquid assets in order to maintain and finance their ongoing drug business; these materials, as well as records, generally described below, are often kept and maintained within premises controlled or used by the drug traffickers within safes or lock boxes;

e.  drug traffickers maintain in their residences computerized or written books, records, receipts, diaries, ledgers, calendars, personal telephone/address books, airline tickets, airline schedules and airline receipts, cashiers checks, money orders, telephones with memory capabilities, telephone answering machines and telephone answering tapes, and other papers relating to the transportation, ordering, sale and distribution, of controlled substances and the outstanding debts and collections

from controlled substances that have been distributed; these materials are often maintained within the electronic memory of personal computers, iPads or other computerized tablets, external hard drives, memory cards and "thumb drives" kept and maintained at premises under the control of the drug traffickers;

f.  drug traffickers commonly provide narcotics on consignment sale to their customers, who subsequently pay for the drugs after reselling the drugs.  Therefore the above mentioned books, computerized records, records, receipts, notes, ledgers, et cetera, will be secured by the drug traffickers within their residences for their ready access to them for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

g.  drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone and beeper numbers of drug associates within their residences, for ready access and to conceal them from law enforcement agencies;

h.  drug traffickers commonly maintain records reflecting names, nicknames, addresses, and telephone numbers of both their current and past drug associates;

i.  drug traffickers who are aware of an ongoing criminal investigation will often destroy an existing format of records reflecting their drug transactions.  However, it is common for drug traffickers, particularly traffickers who provide or receive drugs on a consignment basis, to create another type of drug record to assist the trafficker in the collection of drug debts;

j.  drug traffickers commonly use their homes to store records and/or receipts reflecting the collection of drug debts and the distribution of controlled substances,

27

as well as records and receipts reflecting the expenditure of drug proceeds for personal and business assets;

k.  drug traffickers will commonly conceal within their residences or within the curtilage of their residences, quantities of narcotics, large amounts of currency, firearms, financial instruments, jewelry, electronic equipment and other items of value and proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, and spending large sums of money derived from drug trafficking;

l.  drug traffickers will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services such as safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate and business fronts;

m.  persons involved in drug trafficking who are aware of a criminal investigation into their financial drug activities, will conceal, liquidate, and transfer easily movable drug derived assets in order to prevent law enforcement agencies from seizing and forfeiting their assets;

n.  drug traffickers often have photographs, slides, or video movies of themselves, their co-conspirators and the property and assets purchased with drug proceeds.  These photographs and video movies are normally in the drug traffickers possession or residence;

o.  The State of Connecticut is generally viewed as a consumer state in regards to narcotic activity.  However it is common for drug traffickers to travel to other states that are considered major distribution centers to purchase their narcotics for

28

distribution. It is known that after purchasing these narcotics, drug traffickers will transport these narcotics or cause them to be transported to those areas in which they will be distributed to their customers. It is known that drug traffickers' methods include, but are not limited to: commercial airlines, private motor vehicles, tractor trailer units, public transportation, and motor vehicles with concealed compartments, and government and contract mail carriers. It is known that the residences of drug traffickers will often contain records of drug related travel. These records may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel;

p.  based on my training and experience, drug traffickers commonly have firearms and other weapons in their possession, in their cars, on their person, at their residence including, but not limited to handguns, rifles, shotguns, automatic weapons, and knives. These firearms and weapons are most often kept to protect and secure drug traffickers' property;

q.  based on my training, experience and participation in this and other drug trafficking investigations, I know that it is generally a common practice for drug traffickers to store their drug inventory and drug related paraphernalia in their residences, cars or those of trusted associates. This paraphernalia frequently includes scales, funnels, sifters, grinders, plastic bags, heat sealing devices, and dilutant;

r.  based on my training and experience, drug dealers often create secret locations, commonly called "traps," in their automobiles. Often, drug dealers will use these automobiles to store narcotics, weapons, money and other items and documents related to their drug trade; and

29

s.  based on my training, experience and participation in this and other drug trafficking investigations, I know that drug traffickers often possess, maintain and control other items related to their drug trafficking activities, as described in Attachments A to this affidavit, in their cars, homes, garages and out-buildings, and in safes or lock boxes maintained at such locations.

## Additional Information Regarding Cellular Telephones

### *Biometrics and Cellular Telephones, Including the Target Telephones*

89.  The warrant I am applying for would permit law enforcement to obtain from the **Subjects** the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) to unlock the **Target Telephones** or other devices seized pursuant to the warrants.

90.  I seek this authority based on the following:

a.  As noted above, I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices (e.g., an Apple iPhone), offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple Inc., offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the

device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

91.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

92.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of

time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. *See About Face ID advanced technology*, https://support.apple.com/en-us/HT208108 (published January 10, 2024). Biometric features from other brands carry similar restrictions. Thus, in the event one or more device is located and equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

93.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, if the attempt to unlock the **Target Telephones** via biometric feature is unsuccessful, law enforcement will attempt to forensic unlock the devices.

94.     Due to the foregoing, the warrants I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs), to the fingerprint scanner of the device; (2) hold the device in front of his face to activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant with respect to the **Target Telephones**, or with respect to any other cellular device(s) seized (but not searched) from the search of the person of **GARCIA** and **VARGAS** solely to

(a) change the passcode to allow reentry and (b) place the device into airplane mode to facilitate subsequent search by a separate warrant if sought and obtained.

95.     I am not requesting that any force be authorized to effectuate a press or swipe of fingers or to activate facial recognition features. Should anyone refuse to unlock devices using biometric features, I will promptly notify the Court to request an order to show cause for refusal to unlock devices using biometric features, and/or a further order to compel, and/or a request that the refusing individual be held in contempt of this Court.

### *Electronic Storage and Forensic Analysis of the Target Telephone*

96.     The warrants applied for the **Target Telephones** would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B). Therefore, I believe that seizing and searching the **Target Telephones** is the only investigative option available to law enforcement to obtain evidence of the **Target Offenses** without the cooperation of **GARCIA** and/or **VARGAS**.

97.     As described above and in Attachments B-3 and B-4, the undersigned Affiant seeks permission to search and seize evidence that the **Target Telephones** might contain, in whatever form they are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period on the device. This information can sometimes be recovered with forensics tools.

98.     Searching for the evidence described in Attachments B-3 and B-4 may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming

manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachments B-3 and B-4 or perusing all stored information briefly to determine whether it falls within the scope of the warrant. Considering these difficulties, FBI, or other law enforcement agency, intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachments B-3 and B-4.

99.    Based on my training and experience, as well as information asserted herein, there is probable cause to believe, and I do believe, that within the **Target Telephones** there will be found items which constitute evidence of the crimes of the Target Offenses.

100.    Based on my training, experience, I also know that the **Target Telephones** may have some or all of the capabilities that allow it to serve as digital camera and video recorder, portable media player, global positioning system (GPS) navigation device, a hand-held radio, and a personal digital assistant (PDA).  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the particular device, as well as evidence relating to co-conspirators with whom the device was in contact.

101.    With regards to the **Target Telephones**, I request permission to seize and search the **Target Telephones** for evidence relating to the Target Offenses.

102.    Based on my training and experience, and as set forth in this affidavit, I know wireless telephones are used by co-conspirators to communicate efforts to conduct criminal activities and it is likely that the **Target Telephones** was used by **GARCIA** and **VARGAS** to communicate with co-conspirators regarding the Target Offenses. Furthermore, based on my training and experience, I know that internet-browsing history in wireless phones can contain evidence of text communications between co-conspirators who distribute narcotics, or conspire to do so. Also based on my training and experience, I know that internet-browsing history in wireless phones can contain evidence of internet searches for locations and addresses used for storing and distributing narcotics. Also based on my training and experience, wireless phones may contain videos and images of co-conspirators, possible locations to ship, receive, or store narcotics, the quantity of narcotics, as well as shipping packages within which the narcotics are concealed. Specifically, based on my training and experience, I know the following information tends to exist on wireless telephones, including phones used by those involved in the distribution of narcotics:

    a.   the telephone number, ESN number, IMEI number, other identifying number, serial number, and SIM card number of said telephone;

    b.   the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of said device;

    c.   descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes;

    d.   any and all records, however created or stored, which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph

35

of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

e.  any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

f.  GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

g.  saved searches, locations, and route history in the memory of said devices;

h.  internet browsing history, to include, internet searches in the memory of said device; and

i.  images and videos in the memory of said device.

103.    It is also requested that the Court authorize the retrieval of the above-described stored electronic information by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device. I am aware that in some cases the software or equipment necessary to analyze wireless telephones in this manner is not readily available to law enforcement during the course of the execution of a search and/or arrest warrant. Further, turning on wireless phones in a non-laboratory setting, where there is no "jammer" active or radio shielding devices, permits additional signals to be received by the phone and thereby alters the data present in the phone at the time of seizure. Therefore, it is often necessary to remove a seized phone to a laboratory in order to preserve the data therein from being corrupted.

104.    It is also requested that the warrant be deemed executed once the transfer of the items listed in Attachments B-3 and B-4 has been begun from the phone and that further analysis of the seized items be permitted at any time thereafter.

105.    It is also requested that stored electronic information, data, information and images contained in the **Target Telephones** may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device.

## AUTHORIZATION REQUEST

106.    Separate and distinct Attachments A, describing the items believed to be contained within the Subject Premises to which the attachment pertains, are attached to the warrants. Separate and distinct Attachments B, describing the Subject Premises to be searched (and including photographs of the premises) are attached to the warrants.

ALEX RIVERA
Digitally signed by ALEX RIVERA
Date: 2024.11.12
11:30:58 -05'00'

Alex J. Rivera Jr
Task Force Officer
Federal Bureau of Investigation


The truth of the foregoing affidavit has been attested to me by FBI Task Force Officer Alex Rivera over the telephone on this ___12th___ day of November 2024, at New Haven, Connecticut.

Robert M. Spector
Digitally signed by Robert M. Spector
Date: 2024.11.12
12:44:23 -05'00'

HONORABLE ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE